## Klahold v. Klahold

470

C.P. of Berks County, no. 1035-94 A.D.

*Robert H. Reese Jr.,* for plaintiff.
*Richard C. Funk,* for defendant.

GRIM, *J.,* March 21, 1996—The above captioned matter is a custody dispute. The following are the pertinent facts.

The parties were formerly married. They are the parents of a daughter, Kelly Ann, born April 25, 1988. The parties' final separation occurred in March 1991. They were divorced in April 1992. Since the separation Kelly has lived with defendant, Sherry L. Klahold. Plain-

tiff, Mark E. Klahold, is seeking primary physical custody.

Plaintiff, Father, lives in Ephrata, Pennsylvania. He is unemployed and on disability due to injuries suffered in an automobile accident in September 1994, when a drunk driver hit him. Prior to the accident he had been self-employed as a dry wall hanger for 12 years. In fall 1995, he started courses in marine biology at Harrisburg Area Community College in Lancaster, Pennsylvania. He took one course each semester in 1995. He planned to take two courses per semester in 1996. He hoped to graduate in 1998 and transfer to another college to pursue a Ph.D. in marine biology; however, he does not want to move from the Lancaster area.

Father lives in a two bedroom apartment in an apartment complex. Kelly has her own bedroom. If he were to become employed again, Kelly's former baby sitter has agreed to care for her if the court awarded Father primary physical custody. The baby sitter lives two to three miles from Father's residence.

Under the present order Father gets custody of Kelly on alternate weekends, alternate holidays, and two weeks for vacation. For seven months in 1992 Father voluntarily did not exercise his custody rights. In 1995 Father did not have Kelly for vacation; he testified that defendant, Mother, does not cooperate with him so he did not request vacation time.

Father testified that he desires custody of the child because he believes that Mother continually uses the child against him and does not provide him with information about Kelly's education and activities. Father stated that when he tries to find out things about Kelly from Mother she yells and curses at him. Father does

not know if Kelly has witnessed any of the confrontations between her parents.

Mother's former paramour, Jeffrey Nester, sexually molested Kelly when they were living together. Mother separated from him when she learned that the molestation had occurred. Father, however, believes that Mother still has a relationship with Mr. Nester and he wants to remove Kelly from any danger. Father testified that he has seen Mr. Nester three times at Mother's residence after the time that Mr. Nester was no longer to have any contact with the child. The last time Kelly voluntarily told Father that she had seen Mr. Nester was in 1994.

Kelly tells Father that Mother is mean to her and that he says nicer things to her than Mother does. Father believes that he can offer Kelly a more loving home than Mother does.

Father used marijuana and cocaine during most of the marriage. He testified that his last drug usage was three months prior to the parties' separation. Mother has no knowledge of any recent use by Father.

Mother lives in an apartment in Mohnton, Pennsylvania with Kelly. Kelly has her own bedroom. Mother has always been the child's primary caretaker. Mother worked during the marriage. When she was unavailable to care for Kelly, the child went to a baby sitter even during Father's periods of unemployment; Father had not felt capable of caring for Kelly.

Mother testified that Father has a problem coping with anger. She testified that Father had employed her brother during their marriage. When her brother had quit to work elsewhere, Father then decided to kill her brother and his family with his gun. After this incident Father was admitted to a psychiatric unit for two weeks. This episode occurred before Kelly's birth.

Mother claims that Kelly is scared and nervous about visiting Father and her anxiety has impacted negatively on her academic performance this year. Prior to this school year Kelly had done well in school.

Kelly is in second grade. She daydreams in class. Sometimes she does not do her homework when she is with Father although she tells Mother that she has done it. When Mother calls Kelly at Father's residence to determine if Kelly has completed her homework, Father refuses to allow Mother to talk to the child and hangs up on her. Mother has not informed Father about Kelly's problems in school because she feels that there is nothing he can do to help the situation.

Mother admits that the parties do not communicate. She puts copies of Kelly's report cards in her bag but she does not give Father any other information pertaining to school.

Mother takes Kelly to counseling for children who are victims of sexual abuse. Father wants to participate in these sessions but Mother testified that they are only for the children.

Mother doubts Father's parenting ability. Father took two showers with Kelly. Father told Mother that he had done so to save time. On the first occasion he wore nothing. For the second shower he had donned swimming trunks. Kelly also complains to her that Father enters her bedroom without knocking.

Mother testified that since the sexual abuse was made known, Kelly has had no contact with Jeffrey Nester. Mother has no intentions to reunite with him.

Kelly told the court that she wants to live with Mother and visit Father less often. She is unhappy with Father because he always yells at her and refuses to allow her to talk to Mother when she visits. She stated that

she has not seen Jeffrey Nester since she had informed people about his conduct. She said that both parents and Mother's relatives use bad words when they talk about the other parent and it upsets her to hear them.

Michelle L. Munson Ph.D., did the psychological custody evaluation. The parties stipulated that her report could be admitted into evidence without the necessity of testimony.

Dr. Munson believes that Father possesses no insight. He is grossly immature and impulsive. He has poor follow-through with his ideas. He has poor boundaries with Kelly whom he frequently treats as a peer companion. Father puts substantial pressure on Kelly by informing her of his emotional needs and expecting her to fulfill them. Father insists that Kelly tell him negative things Mother may have done.

Dr. Munson believes that Mother's judgment and general level of functioning are good. Mother does well in the role of mother. Mother sets appropriate limits and boundaries for Kelly.

Dr. Munson determined that Kelly loves both parties. Kelly, however, lies to both parents, especially Father, in order to please them and "make them feel better." Since the parties do not check out the information Kelly tells them, they treat the lies as truths. Kelly appears confused about the parties' ongoing inability to cooperate or communicate.

Kelly suffers from an adjustment disorder with mixed emotional features subsequent to the sexual abuse. Dr. Munson believes that she is also at risk of developing a more extensive and far more manipulative disorder if her parents do not begin to resolve their issues and start communicating with one another rather than confiding in their child.

Dr. Munson recommends, inter alia, that Mother retain primary physical custody of Kelly and that Father receive liberal periods of custody including one evening per week, alternate weekends, half of each school vacation and at least four weeks during the summer. Dr. Munson also recommends that Father involve himself in a parenting class that discusses developmental needs of children and appropriate parenting responses to those needs. Dr. Munson believes that the parties should engage in counseling to develop communication skills with one another to parent their daughter effectively.

In custody disputes the controlling question and paramount concern of the court are the best interests of the child; all other considerations are deemed subordinate to the child's physical, intellectual, moral, and spiritual well-being. *Warren v. Rickabaugh,* 410 Pa. Super. 431, 600 A.2d 218 (1991).

In the case sub judice both parents love Kelly and are genuinely interested in playing a role in her future. Kelly has done remarkably well considering the pressures she bears from her parents' inability to cooperate, her desire to appease both parties, and the residual emotional trauma from the sexual abuse. Unfortunately, but not surprisingly, Kelly is now demonstrating signs that she is becoming overwhelmed by the forces closing in on her; her school performance is disintegrating and she exhibits reluctance to visit Father. This child is clearly at risk!

The court will order that the parties attend parenting counseling together in order for them to communicate better and to parent Kelly more effectively. Kelly is young; the parties have many more years in which they must associate with each other for Kelly's welfare. If better cooperation does not start immediately, their only result will be a child who acts out. Dr. Munson

found that Kelly is already becoming manipulative. The fault for this behavior lies with her parents. If they wish to continue to destroy a bright child, then they are headed in the right direction. The court, however, wants this destructive process to stop posthaste.

Mother has always been Kelly's primary caretaker. Although her judgment in men may be poor, Mother took the appropriate action when Jeffrey Nester's molestation became evident. It is to her credit that Kelly has adjusted as well as she has. Insofar as a parent's past performance is likely to be predictive, judicial inquiry to identify the primary caretaker will yield evidence concerning the future commitment of a parent. If in the past, the primary caretaker has tended to the child's physical needs and has exhibited love, affection, concern, tolerance, discipline, and a willingness to sacrifice, the trial judge may predict that those qualities will continue. *Stolarick v. Novak,* 401 Pa. Super. 171, 584 A.2d 1034 (1991).

Although Kelly loves both parents very much she clearly wants to remain with Mother. While the wishes of a child are not controlling, they do constitute an important factor which must be considered in determining the child's best interests. *In re Custody of Pearce,* 310 Pa. Super. 254, 456 A.2d 597 (1983).

A hearing judge must consider uncontradicted expert testimony. *Murphey v. Hatala,* 350 Pa. Super. 433, 504 A.2d 917 (1986). The court has given great weight to Dr. Munson's report. It agrees with her findings and suggestions. The court believes that a change of primary custody is not warranted. Father has never cared for Kelly on a full-time basis. His parenting decisions, at times, are questionable. He sometimes puts his own needs before those of Kelly or he assigns his needs to Kelly to ratify them. Although Mother may not inform

Father of all relevant information regarding the child, Father does not exert himself unduly to obtain the information.

The court believes, however, that Father is a caring parent who possesses positive virtues. He clearly loves Kelly and wants to spend more time with her. A parent's ability to care for his child must be determined as of the time of the custody hearing, not as of an earlier time. *Bresnock v. Bresnock,* 346 Pa. Super. 563, 500 A.2d 91 (1985). Since Father is now willing to take more parenting responsibility, the court will increase his periods of custody and visitation.

In order to reduce the opportunity for hostilities to occur between the parties the court has attempted to craft a precise order. In accordance with the foregoing opinion, the court enters the following order.

## ORDER

And now, March 21, 1996, it is hereby ordered as follows:

(1) The parties shall share legal custody of the minor child.

(2) Defendant, Sherry L. Klahold ("Mother"), shall have primary physical custody of the child subject to the rights of plaintiff, Mark E. Klahold ("Father"), to partial custody and visitation as follows:

(a) He shall have the right of partial physical custody on alternate weekends from the close of school on Friday until Sunday at 6:30 p.m. If a holiday falls on the Monday following Father's weekend, Father shall retain custody until Monday at 6:30 p.m.

(b) He shall have the right of physical custody every Wednesday from the close of school until 7 p.m.

(c) Father shall have primary physical custody of the minor child the third week of June. Mother shall have the right of partial custody on Wednesday from 3 p.m. until 7 p.m. during this period.

Father shall have primary physical custody of the minor child the second and third weeks of July and August. During these periods Mother shall have the right of partial physical custody on the first weekend of Father's periods of partial custody from 6:30 p.m. on Friday until Sunday at 6:30 p.m. and every Wednesday from 3 p.m. until 7 p.m.

Father's two weeks of uninterrupted custody for summer vacation purposes takes precedence over Mother's periods of partial custody.

(d) At such other times as the parties may mutually agree.

(3) The parties shall alternate the following named holidays from 5 p.m. the preceding evening until 6:30 p.m. on said holiday: New Year's Day, President's Day, Easter Sunday, Memorial Day, July 4, Labor Day, Thanksgiving Day.

(4) Father shall always have custody of the minor child from 9 a.m. until 7 p.m. on Father's Day and Mother shall always have custody of the minor child from 9 a.m. until 7 p.m. on Mother's Day.

(5) During each Christmas vacation period, the parties shall alternate the following periods of partial custody:

(a) December 23 from the close of school to December 24 at 7 p.m.

(b) December 24 at 7 p.m. to December 25 at 3 p.m.

In 1996 Father shall have no. a. And in 1997 Father shall have no. b. This pattern shall repeat every two years.

Father shall also have custody of the minor child for two additional days during the Christmas vacation period. This shall include one overnight period.

(6) The holiday schedule shall take precedence over the regular custody schedule.

(7) Each parent shall have physical custody of the minor child for summer vacation purposes for two weeks. Summer vacation periods are to be uninterrupted. Each party shall give the other party 60 days written notice as to his or her selection under this paragraph. The two weeks of uninterrupted vacation may be divided into two periods of one week each. Each parent shall schedule the child's vacation with the parent when the child is scheduled to be with the parent.

(8) The parent receiving the child shall provide the transportation.

(9) Both parties shall have the following rights with respect to the child: reasonable telephone calling privileges limited to one call per day except when the child is ill; access to report cards and other relevant information concerning the progress of the child in school; approval of extraordinary medical and/or dental treatment except in the case of an emergency and provided that such approval shall not be unreasonably withheld; approval of summer camp and schools provided that such approval shall not be unreasonably withheld; and both parties shall provide to the other all information as much in advance as possible of any matter respecting the child so as to provide the other parent ample opportunity to participate and/or attend official functions and/or medical or educational appointments.

(10) In the event of any serious illness of the child at any time, the party then having custody of said child shall immediately communicate with the other party by telephone or any other means, informing the other party of the nature of the illness. During such illness, each party shall have the right to visit with the child as often as he or she desires, consistent with the proper medical care of said child. The word "illness" as used herein shall mean any disability which confines the child to bed under the direction of a licensed physician for a period in excess of 48 hours.

(11) The parties are ordered to commence counseling immediately with a neutral evaluator for a minimum of five counseling sessions unless additional or fewer sessions are deemed necessary by the evaluator and so ordered by the court. If an evaluator cannot be agreed upon by the parties, then Dr. Peter Thomas will conduct the counseling sessions. Said counseling is ordered to facilitate the growth of all parties towards improving communication and cooperation between themselves and to facilitate better parenting by both parties. A report is to be made available to the court upon the completion of the counseling. Each party is responsible for his or her own costs regarding the payment for these sessions.

(12) The minor child is to have no contact with Jeffrey Nester or members of his family unless it is specifically deemed appropriate for a therapeutic reason by the child's counselor.

(13) Neither party shall disparage or denigrate the other parent in the presence of the child nor permit others to do so. Each parent will try to encourage the development of the parent-child relationship between the child and each parent.